Thomas T. McCormick, SBN 112723
**MCCORMICK LAW FIRM**
A Professional Corporation
21-C Orinda Way, #203
Orinda, CA 94563
Telephone: 925.253.3700; 925.787.0925
Facsimile: 925.254.4174

Attorneys for Plaintiffs,
ELIZABETH (BETSY) B. ROSS

FILED
08 JUL -1 AM 10: 57
RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ELIZABETH B. ROSS,<br><br>          Plaintiff,<br><br>     v.<br><br>GREGORY A. STRANGER; CORALIE K. STRANGER; THE STRANGER FAMILY 2003 TRUST, A CALIFORNIA TRUST; CAPITAL DEFEASANCE GROUP, LLC; SUCCESSOR BORROWER SERVICES, LLC; AND DOES 1-100, inclusive,<br><br>          Defendants. | Case No. CV 083106 BZ<br><br>**NOTICE OF MOTION AND POINTS AND AUTHORITIES IN SUPPORT OF MOTION TO DISMISS PLAINTIFF'S TENTH CAUSE OF ACTION.**<br><br>DATE: August 13, 2008<br>TIME: 10:00 AM<br>COURTROOM: G, Hon. Magistrate Bernard Zimmerman<br><br>Complaint Removed And Filed In Federal Court: June 25, 2008<br>Trial Date: Non-Assigned |

## NOTICE OF MOTION

TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:

PLEASE TAKE NOTICE that on August 13, 2008, in Courtroom G, the Honorable Bernard Zimmerman, Magistrate of the United States District Court, Northern District of California, located at the 450 Golden Gate Avenue, Fifteenth Floor, San Francisco, California, 94102, Plaintiff ELIZABETH B. ROSS will move this Court for an order allowing Plaintiff to dismiss the Tenth Cause of Action (Securities Violations) of the complaint.

1   This Motion is made on the grounds that Plaintiff seeks to dismiss the Tenth Cause
2   of Action which will divest this court of jurisdiction since the remaining causes of action are all
3   state court claims, where there is no federal question. This motion is made pursuant to Federal
4   Rules of Civil Procedure § 41(a)(2). Plaintiff requests the motion to dismiss be heard first.

Plaintiff has also filed a motion for remand of the action to the Marin County Superior Court pursuant to 28 U.S.C. § 1447 (c). Plaintiff requests that this motion to remand be heard second.

Plaintiff has attempted to meet and confer on this matter and defendants have refused. Plaintiff offered to dismiss the Tenth Cause of Action by stipulation. Defendants' attorney indicated they rushed to file an answer to plaintiff's complaint, which was filed the same date as the Notice of Removal, in order to force a motion to dismiss and motion for remand. Plaintiff offered to stipulate to dismiss the Tenth Cause of Action and for remand or the entire action in order to have the matter heard in the state court where the action arose and causes of action will be governed. Defendants' attorney stated he would speak to his clients and get back to Plaintiff; however, he never responded. Therefore, this motion was necessary.

This motion is based upon this Notice, the Memorandum of Points and Authorities in support of the motion referred to herein, the Declaration of Thomas T. McCormick and such further proof as may be presented at the hearing.

Dated: June 27, 2008.

By _____
Thomas T. McCormick,
McCormick Law Firm, PC.,
Attorneys for Plaintiff Elizabeth B. Ross

## MEMORANDUM OF POINTS AND AUTHORITIES

### A. INTRODUCTION

Plaintiff filed this action in Marin County Superior Court on June 24, 2008. The complaint states ten causes of action against defendants that are based on simple facts – defendants took plaintiff's money under false pretenses and will not return the money. One cause of action, plaintiff's tenth cause, alleges defendants violated securities laws for failing to comply with securities laws. The claim is ancillary to the primary claims contained in the first nine causes of action.

On August 8, 2007, Plaintiff Ross gave a check for $100,000.00 to Defendants Greg Stranger, Capital Defeasance Group, LLC and Successor Borrower Services, LLC in exchange for a fifty percent (50%) equity ownership interest in and fifty percent (50%) cash distribution from Defendant companies. Defendants then refused to give Plaintiff her fifty percent (50%) interest in the Defendant companies and have stated they will not complete the agreement. Defendants have stated the money has not been spent and is available in the company bank accounts. Defendants have stated they will spend the money if Plaintiff fails to do as they direct.

Defendants are using Plaintiff's name and experience on their website and on marketing materials. Plaintiff has not worked for the defendant companies since December 12, 2007 and has asked and demanded that Defendants remove her from the website and marketing materials. Defendants refuse to remove Plaintiff from the website and marketing materials.

On June 24, 2008, plaintiff gave notice to defendants that on June 26, 2008, she would seek a temporary restraining order against defendants to stop them from dissipating $107,149.49 (plaintiff's money) and from using her name, likeness and experience on its web site.

On June 25, 2008, defendants filed a Notice of Removal and an Answer to the Complaint with this court and the Notice of Removal with the Marin County Superior Court. Apparently, Defendants delivered a copy of the notice to plaintiff's attorneys office address after he had left for the day on June 25, 2008, and did not call or give any other notice.

On June 26, 2008, at 9:00 AM, plaintiff appeared in the Marin County Superior Court and obtained the Temporary Restraining Order against defendants; a true and correct copy of which is attached hereto as **Exhibit A**. Thereafter on June 26, 2008, plaintiff's attorney called defendant's attorney to give notice of the TRO; this is when defendants gave actual notice of filing the Notice of Removal. At the time the Marin County Superior Court issued the TRO, neither plaintiff nor the judge had knowledge of the Notice of Removal.

On June 27, 2008, plaintiff's attorney called defendants' attorney to discuss a stipulation to dismiss the tenth cause of action; this is when defendants gave actual notice of filing an answer to the complaint in Federal Court, allegedly on June 25, 2008. As of this writing, plaintiffs have not received a copy of defendants' answer.

Plaintiff seeks to dismiss the tenth cause of action and have this action remanded to the Marin County Superior Court.

### B. HISTORICAL FACTUAL BACKGROUND

On or about March 2, 2006, Greg Stranger contacted Ross and discussed his idea to start a defeasance consulting firm. Greg Stranger asked Ross whether she had any commercial real estate industry contacts that may be interested in defeasance. Ross, having many contacts in commercial real estate, offered to introduce the defeasance program to them when Greg Stranger was prepared to move forward.

On or about April 24, 2006, Stranger formed Capital Defeasance Group, LLC (CDG), a Delaware limited liability company. On or about June 1, 2006, Stranger formed Sierra Crest Financial, LLC (SCF), and Successor Borrower Services, LLC (SBS), both Delaware limited liability companies. SCF was organized to hold the Member ownership interests in CDG and SBS. The Stranger Trust is the sole owner and Member of SCF and SCF was the sole owner and Member of CDG and SBS. Defendants have represented that SCF was dissolved and all the interest it owned in CDG and SBS have been transferred to The Stranger Trust. Corey Stranger and Greg Stranger are co-trustees of The Stranger Trust and as such the sole owners and controlling Managing Members of CDG and SBS.

In June 2006, Greg Stranger asked Ross to join CDG and SBS. Greg Stranger and Ross met several times in June 2006 to discuss the defeasance business and the potential of being co-owners. Ross was interested in joining the company as an owner, but was not ready to make a final decision. Therefore, Greg Stranger and Ross agreed that Ross would work for CDG and SBS for the summer on an unpaid basis, and tell Greg Stranger by the end of the summer whether she would become an owner. Greg Stranger and Ross also agreed that if Ross joined CDG and SBS as an owner, they would each own 50% of the company. Greg Stranger represented, in order to entice Ross, that he would provide the seed capital to start CDG and SBS, which was expected to be approximately $50,000.

On or about July 6, 2006, Ross and Greg Stranger, with their spouses, met over dinner at Ross' house to discuss details of the ownership and to make sure their spouses agreed with the business plan. At this dinner meeting, the parties discussed the equity structure, payout based on sweat equity, deal sourcing and other matters. Greg Stranger again represented that he would fund the startup costs for the company. By the end of the meeting, the parties agreed that the structures discussed were complicated and might cause discord in the future; therefore, the parties agreed to stick with the original agreement that Ross and Stranger would each own fifty percent (50%) of CDG and SBS.

During the summer of 2006, Ross and Greg Stranger worked on starting the company. Ross contacted people she knew from her commercial real estate career; in August 2006, CDG signed its first deal with one of Ross' contacts.

On or about Labor Day 2006, Ross told Greg Stranger that she would join the company as a co-owner, as they had agreed with each owning fifty percent (50%) of CDG and SBS. Thereafter, on or about September 10, 2006, Greg Stranger and Ross had lunch during which Greg Stranger informed Ross that he no longer thought they should each own fifty percent (50%) of the companies and that he believed he was entitled to a larger share of the company since the company was his idea and he was funding the start-up of the companies.

On October 6, 2006, after much negotiation, Greg Stranger and Ross signed an agreement under which each would own fifty percent (50%) of CDG and SBS, but the cash flow

would be split differently in order to compensate Stranger for initiating the idea and funding the start-up. The agreement states that Greg Stranger would initially receive 70% of company cash flow up to the threshold of $1,625,000 in profits, then 60% up to the second threshold of $3,250,000 in profits, and finally 50% thereafter in perpetuity; and Ross would initially receive 30% of company cash flow up to the threshold of $1,625,000 in profits, then 40% up to the second threshold of $3,250,000 in profits, and finally 50% thereafter in perpetuity. Ross and Stranger also agreed that Greg Stranger would fund the company up to $50,000, and they would borrow any additional funds, if necessary.  Greg Stranger asked the company attorney, Christian Henrich, to draft "formal" agreements to memorialize the October 6, 2006 agreement. The company attorney is Christian Henrich ("Henrich"), partner with the law firm of Damon & Morey in Buffalo, New York. The October 6, 2006 agreement is attached to the complaint filed herein as **Exhibit A**.

Later in October 2006, Commercial Defeasance, LLC, the company that Greg Stranger had consulted with on the defeasance business while at Boston Consulting Group (BCG), filed and served a lawsuit against Greg Stranger for theft of Commercial Defeasance's business plan and trade secrets. Greg Stranger hired Morgan Lewis & Bockius (MLB) to defend him in the lawsuit. Later, Commercial Defeasance amended its lawsuit to name CDG in the action; thereafter, MLB also defended CDG in the action.

On or about January 5, 2007, at the request of Greg Stranger, Chris Henrich, CDG's counsel, sent an email outlining and memorializing what he had been told by Greg Stranger what the October 6, 2006 agreement should include. Henrich's January 5, 2007 email and attachments state that Ross and Stranger agreed each would own fifty percent (50%) of the equity and split the case flow as set forth in the October 6, 2006 writing. Henrich's January 5, 2007 email and attachments are attached to the complaint filed herein to the complaint filed herein as **Exhibit B**.

Later in January 2007, CDG and Greg Stranger received bills totaling over $300,000.00 from MLB for defense of the Commercial Defeasance lawsuit. These bills were more than the company could afford. Therefore, Greg Stranger informed Ross that he did not

have the money to pay the bill and asked Ross to loan CDG money. Ross declined to make the loan; however, Ross offered to match the Strangers' equity investment of $100,000.00 in exchange for a new agreement where each would own fifty percent (50%) of the equity in CDG and SBS, and the cash flow distributions would change so each would receive fifty percent (50%) of the cash flow from CDG and SBS. Greg Stranger did not accept Ross' offer; therefore, Ross and Stranger discussed the matter for two months.

On or about March 1, 2007, Henrich sent Ross and Stranger a draft of the Limited Liability Operating Agreement for CDG and SBS that incorporates and memorializes many of the agreements made between Ross and Stranger on October 6, 2006 – specifically that each owned fifty percent (50%) of the companies. The draft is dated March 1, 2007. Henrich's March 1, 2007 draft LLC Operating Agreement is attached to the complaint filed herein as **Exhibit C**.

On March 8, 2007, Ross informed Greg Stranger that she was leaving CDG and SBS since she was concerned about financing the companies and the lawsuit and did not want to work for free for companies that did not have the financial ability to survive. Later that day, Greg Stranger went to Ross' home and told Ross that he did not want her to leave the companies and asked her to come back on Monday, March 12, 2007, to work out a new arrangement where each would own fifty percent (50%) of the equity in and receive fifty percent (50%) of the cash flow from CDG and SBS.

On Monday, March 12, 2007, Greg Stranger represented to Betsy Ross that he would give/sell her fifty percent (50%) of the equity in and she would receive fifty percent (50%) of the cash flow from CDG and SBS if she agree to work for no pay and invested $100,000.00 in the company. In reliance of Greg Stranger's representations, Ross agreed to give $100,000.00 to Greg Stranger, CDG and SBS, and agreed to work for the CDG and SBS companies for no pay until cash flow improved. Stranger also represented that he would have the company attorney Chris Henrich draft the appropriate company documents to reflect the new agreement.

Ross would not have entered into the March 12, 2007 agreement with Greg Stranger to give $100,000.00 to CDG and SBS and to work for the companies without pay if Stranger had not represented that Ross would receive fifty percent (50%) of the equity in and cash flow from the CDG and SBS companies. In reliance of Stranger's representations, Ross gave $100,000 to Stranger and worked for the CDG and SBS companies without pay from March 12, 2007 to the time she left on December 12, 2007. Thereafter, Greg Stranger instructed Mr. Henrich to prepare new company agreements to transfer fifty percent (50%) equity and cash flow rights in the CDG and SBS companies to Plaintiff Betsy Ross. Mr. Henrich prepared the documents and sent them to Stranger and Ross to review. Ross stopped working for the companies on or about December 12, 2007, after Stranger informed Ross that he would not sign the new agreements giving Ross fifty percent (50%) equity and cash flow in the CDG and SBS companies.

Between March and July 2007, Greg Stranger and Ross meet many times with MLB to work out a payment plan for MLB's legal bills relating to the Commercial Defeasance lawsuit. Greg Stranger and Ross offered to pay MLB Ross' $100,000.00 investment in CDG and have CDG pay MLB the balance from company cash flow; they also requested that MLB thereafter represent Stranger and CDG in the future for a fixed fee.

On August 8, 2007, in expectation of the settlement with MLB, Ross gave a check for $100,000.00 to CDG and SBS, in accordance with the March 12, 2007 agreement with Greg Stranger. A copy of Ross' $100,000.00 check cashed by SBS is attached to the complaint filed herein as **Exhibit D**.

Later in August 2007, MLB declined to accept CDG's payment offer and MLB withdrew from the Commercial Defeasance case. MLB is now pursuing legal action against Greg Stranger and CDG for recovery of more than $1,400,000.00 in unpaid legal bills. As a result, Ross' $100,000.00 was never spent and is being held by Stranger, CDG and SBS in order to force her to give up any rights she has in CDG and SBS. According to Stranger and Henrich, Ross' $100,000.00 is still in a CDG or SBS bank account.

During August 2007, Greg Stranger took one month off from the company to write his PhD dissertation. Ross ran the CDG and SBS entities, including training the company's new employee and transacting new business. During August and September 2007, Ross became increasingly concerned that she had given Stranger/CDG/SBS $100,000.00 and did not have a signed document that showed her new interest in the companies of fifty percent (50%) of equity and cash flow in CDG and SBS.

On or about September 17, 2007, Ross sent a memorandum to attorney Henrich, with a copy to Greg Stranger, suggesting changes to the earlier draft agreements that reflected the new agreement made on March 12, 2007. Ross' September 17, 2007 email and memorandum are attached to the complaint filed herein as **Exhibit E**.

On or about September 18, 2007, Henrich sent by email the new company agreements to change ownership and cash distributions as agreed on March 12, 2007. These company documents state that Betsy Ross and Greg Stranger each own fifty percent (50%) of the equity in the CDG and SBS companies and each shall receive fifty percent (50%) of the cash flow from operations. The documents also transfer the interest held by SCF, which owned one hundred (100%) of CDG and SBS as follows: fifty percent (50%) to The Stranger Trust and fifty percent (50%) to Betsy Ross. Included in the documents drafted by Mr. Henrich is a Securities Investment Agreement selling fifty percent (50%) of the interest in CDG and SBS to Betsy Ross in exchange for her $100,000.00. The email and documents sent by Henrich on September 18, 2007, reflecting the March 12, 2007 agreement, are attached to the complaint filed herein as **Exhibit F**.

On September 19, 2007, Mr. Henrich sent an email states his September 18, 2007 email to Greg Stranger and Ross with the March 12, 2007 agreements do not incorporate Ross' comments made in her September 17, 2007 memorandum, because he had previously prepared the documents reflecting the changes and he had not had time to incorporate the concepts set forth in Ross' September 17, 2007 email and memorandum. Mr. Henrich's September 19, 2007 email states that he drafted the documents to reflect the March 12, 2007 agreement at Greg Stranger's direction to address "the capital accounts, ownership, and tax issues" and he had not

yet addressed the issues of "voting, control, buyout, etc.", which he planned on drafting after a conference call with Ross and Stranger. Thereafter, Henrich agreed to update the company documents as the parties directed. Mr. Henrich's September 19, 2007, is attached to the complaint filed herein as **Exhibit G**.

In September, October and November 2007, Ross, Greg Stranger and Henrich schedule several times to review and finalize the agreement documents to change the ownership and cash distributions as Stranger represented on March 12, 2007. Greg Stranger repeatedly cancelled and rescheduled the meetings.

On November 6, 2007, Ross sent Greg Stranger an email asking him to make finalizing the agreement documents a priority. In her email, Ross reminded Stranger that she had made her $100,000.00 payment to him/CDG/SBS and that it was a priority for her to complete the documents. Ms. Ross' November 6, 2007 email is attached to the complaint filed herein as **Exhibit H**.

On November 7, 2007, Greg Stranger handed Ross a check for $100,000.00 and stated he was not going to follow what he had told Ross on March 12, 2007 – that Ross received fifty percent (50%) of the equity and cash flow in the CDG and SBS companies in exchange for her work and $100,000.00. When she received the check, Ross was angry and confused, gave the check back to Greg Stranger and demanded that they follow their March 12, 2007 agreement since she had been working without pay. Stranger accepted the check back and agreed to meet with Henrich as a mediator to finalize the agreement documents.

During November and December 2007, Ross and Greg Stranger each had several conversations with Henrich about the history of the ownership, each person's contributions, Stranger's representations, Ross' reliance thereon and the present agreement documents. Nothing was resolved. During this time, Henrich told Ross that Greg Stranger was unwilling to follow his prior representations and the agreement made on March 12, 2007, that she and Greg Stranger were very far apart and he was not optimistic that they could reach an agreement; therefore, Ross should consider leaving the companies.

Therefore, on or about December 10 and 11, 2007, Greg Stranger and Betsy Ross met Henrich in Chicago. During the meetings, Stranger took the position that since the March 12, 2007 agreement that each would own fifty percent (50%) of the cash flow and equity in CDG and SBS was never signed; therefore, he did not need to now follow it. Stranger also demanded that if Ross would take personal liability for the Commercial Defeasance lawsuit – a lawsuit that did not name Ross. Stranger's new demand was never included in any of the draft documents prepared by Henrich, or notes or emails that reflected the March 12, 2007 agreement and so Ross rejected Stranger's new demand. Thereafter, during the meetings, Greg Stranger also stated that if Ross took over running the companies for no compensation, allowing him to get a job which he needed to do in order to support his family, then he might consider giving Ross fifty percent (50%) of the equity and seventy percent (70%) of the cash flow in the CDG and SBS entities. The discussions end with Ross saying she had no interest in running the companies by herself. Greg Stranger stated that if Ross would not work for the companies without pay, then she would not get her equity or cash flow interest in the companies regardless of the October 6, 2006 and March 12, 2007 agreements.

On December 12, 2007, Ross stopped working for the CDG and SBS companies. Ross maintains that there is value in the companies and, at least, she owns her interest as created in the October 2006 signed agreement. Ross has since demanded her $100,000.00 back and to be reimbursed for her outstanding out-of-pocket expenses of $7,149.49; Greg Stranger agreed to provide both to Ross, but has not.

In late December 2007, without threat of litigation by Ross, Henrich gave a *Mutual General Release* to Ross that stated she sold all her interest in the CDG and SBS companies to Greg Stranger for $1.00; the release does not mention returning Ross' $100,000.00 or reimbursing her out of pocket expenses. The Mutual General Release is attached as **Exhibit I** and incorporated herein.

Ross was not going to give her $100,000.00 to Stranger/CDG/SBS; therefore, she retained an attorney and Henrich took over representing Stranger, CDG and SBS in the negotiations. During December 2007 and January, February, March and April 2008, Ross and

Greg Stranger attempt to negotiate a settlement through their attorneys. On April 29, 2008, with the help of John Bates from Judicial Arbitration and Mediation Services (JAMS), the parties entered into a written agreement to resolve the dispute where Stranger would give Ross $115,000.00 by May 14, 2008 and provide other consideration. The April 29, 2008 agreement is attached to the complaint filed herein as **Exhibit J**.

On April 18, 2008, MLB sent a demand letter to Defendants Greg Stranger and CDG for unpaid attorney fees in excess of $1,400,000.00, with a Notice of Client's Right to Arbitration. A true and correct copy of the MLB letter and Notice of Client's Right to Arbitration are attached to the complaint filed herein as **Exhibit K.**

On or about May 22, 2008, after Plaintiff left the companies, Defendants failed to pay the rent on the lease space. As a result, Plaintiff, as a party to the lease, has been served with a Three-Day-Notice-To-Pay-Or-Quit the tenancy. Plaintiff understands that Defendants are insolvent in that they do not have the money to pay their bills. Three-Day Notice is attached to the complaint filed herein as **Exhibit L.**

To date, Greg Stranger has refused to return Ross' $100,000.00, reimburse Ross out of pocket expenses of $7,149.49, honor the October 6, 2006 or March 12, 2007 agreements, comply with his October 2006 and March 2007 representations, comply with the April 29, 2008 agreement, and remove Ross from the company website and marketing materials. Further, Defendants have substantial debts and have not been paying their bills; therefore, it is believed that Defendants will use Ross' money for their own purposes, making any victory Ross would obtain meaningless, at best. CDG website and marketing materials listing Betsy Ross as part of CDG are attached to the complaint filed herein as **Exhibit M.**

### C. LEGAL ANALYSIS

**a. This Court May Dismiss Plaintiff's Tenth Cause of Action Without Prejudice When Defendants Are Not Unfairly Affected.**

A motion for voluntary dismissal under 41(a)(2) should be granted "unless a defendant can show that it will suffer some plain legal prejudice as a result." *Smith v. Lenches*, 263 F.3d 972, 975 (9th Cir. 2001). Courts generally allow a dismissal without prejudice unless a

1 | defendant can show it will suffer "some plain legal prejudice" as a result of the dismissal.
2 | Hamilton v. Firestone Tire & Rubber Co., Inc., 679 F2d 143, 145 (9th Cir. 1982).

3 |      Defendant cannot establish any prejudice. No discovery has been conducted and
4 | no extraordinary expense has been incurred. The only result this motion to dismiss will cause is
5 | to divest this court of jurisdiction which will result in the case being remanded to the Marin
6 | County Superior Court. The only cause of action, and the only stated reason this action was
7 | removed, was as a result of plaintiff's tenth cause of action for securities violations, which
8 | provide for rescission rights, in offering to sell securities to plaintiff. Plaintiff will still maintain
9 | the remaining nine causes of action.

10 |      Plaintiff has attempted to meet and confer on this matter and defendants have
11 | refused. Plaintiff offered to dismiss the Tenth Cause of Action by stipulation. Defendants'
12 | attorney indicated they rushed to file an answer to plaintiff's complaint, which was filed the
13 | same date as the Notice of Removal, in order to force a motion to dismiss and motion for
14 | remand. Plaintiff offered to stipulate to dismiss the Tenth Cause of Action and for remand or
15 | the entire action in order to have the matter heard in the state court where the action arose and
16 | causes of action will be governed. Defendants' attorney stated he would speak to his clients and
17 | get back to Plaintiff; however, he never responded. Therefore, this motion was necessary.

### D. CONCLUSION

For the reasons set forth herein, plaintiff seeks to dismiss the tenth cause of action in the complaint without prejudice.

June 27, 2008

RESPECTFULLY SUBMITTED,

THOMAS T. McCORMICK, PC.

By: _____
Thomas T. McCormick,
McCormick Law Firm, PC.,
Attorneys for Plaintiff Elizabeth B. Ross.

1  Thomas T. McCormick, SBN 112723
2  **MCCORMICK LAW FIRM**
   A Professional Corporation
3  21-C Orinda Way, #203
   Orinda, CA 94563
4  Telephone:  925.253.3700; 925.787.0925
   Facsimile:   925.254.4174
5

6  Attorneys for Plaintiffs,
   ELIZABETH (BETSY) B. ROSS
7

FILED
JUN 2 6 2008
KIM TURNER, Court Executive Officer
MARIN COUNTY SUPERIOR COURT
By: S. Bond, Deputy

8            SUPERIOR COURT OF THE STATE OF CALIFORNIA – MARIN COUNTY

9  ELIZABETH B. ROSS,                    )  Case No. CV 083069
                                         )
10         Plaintiff,                    )  **TEMPORARY RESTRAINING ORDER
                                         )  AND ORDER TO SHOW CAUSE RE
11     v.                                )  PRELIMINARY INJUNCTION
                                         )  REGARDING DISPOSITION OF FUNDS
12 GREGORY A. STRANGER; CORALIE K.       )  AND USE OF PLAINTIFF'S NAME,
   STRANGER; THE STRANGER FAMILY         )  LIKENESS AND EXPERIENCE.**
13 2003 TRUST, A CALIFORNIA TRUST;       )
   CAPITAL DEFEASANCE GROUP, LLC;        )  ATE: June 26, 2008
14 SUCCESSOR BORROWER SERVICES,          )  TIME: 9:00 AM
   LLC; AND DOES 1-100, inclusive,       )  DEPT: B, Hon. Terrence R. Boren
15                                       )
                                         )  Complaint Filed: June 24, 2008
16         Defendants.                   )  Trial Date: Non-Assigned
                                         )
17

18     The an *Ex Parte* Application by Plaintiff for a Temporary Restraining Order

19 against Defendants from dissipating Plaintiff's money in the amount of $107,149.49 and from

20 using Plaintiff's name, likeness and experience on Defendants' website and in marketing

21 materials came before Department B of the Court on June 26, 2008. The McCormick Law Firm

22 by Thomas T. McCormick, A Professional Corporation, appeared for Plaintiff and moving

23 party. ~~Law Firm of~~ _____, ~~by~~ No one _____

24 appeared for Defendants.

25     Upon consideration of all papers and pleadings filed in regard to this matter, including

26 the Application by Thomas T. McCormick and Declaration of Elizabeth B. Ross, and all

27 evidence considered at the hearing in this matter, and GOOD CAUSE APPEARING, IT IS

28 ORDERED:

COPY

TEMPORARY RESTRAINING ORDER AND ORDER TO SHOW CAUSE. Page 1

EXHIBIT A

1  Defendants, GREGORY A. STRANGER; CORALIE K. STRANGER; THE
2  STRANGER FAMILY 2003 TRUST, A CALIFORNIA TRUST; CAPITAL DEFEASANCE
3  GROUP, LLC; SUCCESSOR BORROWER SERVICES, LLC, are hereby ordered to show
4  cause on July ___, 2008 at ____ AM, or as soon thereafter as counsel may be heard in
5  Department B of the above entitled Court, located at 3501 Civic Center Drive, San Rafael,
6  California, 94903 why you, your agents, servants, assigns and all those acting in concert with
7  you, should not be restrained and enjoined pending trial of the action from (1) dissipating funds
8  in the amount of $107,149.49, ~~(2) if the funds have been dissipated out of Defendant's bank~~ NOT
9  ~~accounts or control, then to whom the funds were given, an~~d (3) using the name, likeness and
10 experience of Plaintiff Elizabeth B. Ross on your website and marketing materials and from
11 stating Plaintiff is a partner of member of your company.
12    Pending hearing on the above Order to Show Cause, you, your agents, servants, assigns
13 and all those acting in concert with you, ARE HEREBY RESTRAINED AND ENJOINED from
14 (1) dissipating funds in the amount of $107,149.49, and (2) using the name, likeness and
15 experience of Plaintiff Elizabeth B. Ross on your website and marketing materials and from
16 stating Plaintiff is a partner of member of your company.
17    No undertaking is required by Plaintiff. ~~OR The above temporary restraining order is~~
18 ~~effective on Plaintiff filing an undertaking in the sum of $_____.~~ NOT
19    This Order to Show Cause and supporting papers shall be served on Defendants no later
20 than JUNE 30TH by Personal service. Proof of service shall be filed
21 and delivered in the manner provided by CCP §527.
22    The following briefing schedule shall apply: Any opposition papers to the OSC shall be
23 filed and served on Plaintiff no later than JULY 9, 2008. Any reply papers to such
24 opposition shall be filed and served on Defendants no later than JULY 11, 2008 at noon.
25
26 Dated: 6-26-08                    [signature]
27                                   The Hon. Terrence R. Boren,
28                                   Judge, Marin County Superior Court.

TEMPORARY RESTRAINING ORDER AND ORDER TO SHOW CAUSE. Page 2

<u>PROOF OF SERVICE BY U.S. MAIL</u>

STATE OF CALIFORNIA, COUNTY OF CONTRA COSTA

    I am employed in the County of Contra Costa, State of California. I am over the age of 18 years, and not a party to this action; my business address is 21-C Orinda Way, #203, Orinda, California 94563.

    On June 27, 2008, I served the documents described as:

**NOTICE OF MOTION AND POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR REMAND OF THE ACTION TO STATE COURT.**
**NOTICE OF MOTION AND POINTS AND AUTHORITIES IN SUPPORT OF MOTION TO DISMISS PLAINTIFF'S TENTH CAUSE OF ACTION.**

on the parties in this action by placing a true copy thereof enclosed in a sealed envelope addressed as follows:

| | |
|---|---|
| George Scott Emblidge | Brian Gwitt |
| Moscone Emblidge & Quadra LLP | Damon & Morey |
| Mills Tower #2100 | 1000 Cathedral Place |
| 220 Montgomery St | 298 Main Street |
| San Francisco, CA, 94104 | Buffalo, New York 14202 |
| Tel: (415) 362-3591 | Tel: 716-858-3834 |
| Fax: (415) 362-2006 | Fax: 716-856-5521 |

    I am "readily familiar" with the firm's practice of collection and processing correspondence for mailing. Under that practice, it would be deposited with the U.S. Postal Service on that same day with first class postage thereon fully prepaid at Orinda, California in the ordinary course of business. I am aware that on motion of the party served, service is presumed invalid if postal cancellation date or postage meter date is more than one day after date of deposit for mailing in affidavit.

    I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

    Executed on June 27, 2008 at Orinda, California.

_____
Thomas T. McCormick

1